**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 21 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

FELIX BARRON-CABRERA,

      Defendant-Appellant.

No. 96-2060

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-95-509-HB)**

_____

Michael W. Lilley, Las Cruces, NM, argued the cause for the appellant.

Lauren A. Mickey, Assistant United States Attorney, Las Cruces, NM, argued the cause for the appellee. John J. Kelly, United States Attorney, Las Cruces, NM, assisted on the brief.

Argued January 15, 1997

_____

Before **PORFILIO, LOGAN**, and **EBEL**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

While driving a rented Ryder truck on a rural road about 45 miles north of the Mexican border, defendant-appellant Felix Barron-Cabrera was stopped by Border Patrol Officer Robert Glenn Garcia. Officer Garcia found 21 illegal aliens in the truck, including Barron-Cabrera. Barron-Cabrera moved to suppress the evidence obtained during the traffic stop, on the grounds that Officer Garcia lacked reasonable suspicion to make the stop. After the district court denied Barron-Cabrera's motion, Barron-Cabrera pled guilty to one count of transporting illegal aliens and aiding and abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) (1994 & Supp. 1997) and 18 U.S.C. § 2 (1994), reserving under Fed. R. Crim. P. 11(a)(2) his right to appeal the district court's denial of his motion to suppress. Barron-Cabrera now brings that appeal. Because we agree with the district court that, under the facts and circumstances of the case, the traffic stop was predicated on reasonable suspicion, we affirm.

## BACKGROUND

On Wednesday, August 30, 1995, Felix Barron-Cabrera was driving north on New Mexico Highway 180, in a rented Ryder truck. The City of Deming, New Mexico (pop. 15,000) was behind him, and Silver City was ahead. Except during morning and afternoon rush hours, when some workers commute between Deming and Silver City, Highway 180 is lightly traveled. There are no established Border Patrol checkpoints on Highway 180, which bypasses other north-south routes with

established checkpoints. However, in April 1995, the Northern County Unit of the Deming Border Patrol station began daily patrols of Highway 180 north of Deming. Between April 1995 and October 1995, that Unit apprehended 30 "smuggling loads" carrying a total of 140 illegal aliens on Highway 180 north of Deming.

At about 2:45 p.m., Barron-Cabrera drove a Ryder truck past a marked Border Patrol vehicle (a white Chevy Suburban) which was being driven southbound by Officer Robert Glenn Garcia. Officer Carlos Roches was a passenger in the Border Patrol vehicle. At that time, Barron-Cabrera was driving north at about 55 mph, and Officer Garcia was driving south at 45 mph. Officer Garcia testified that he was suspicious of Ryder trucks because he knew that a Border Patrol unit operating out of Lordsburg, New Mexico had recently apprehended a rental truck filled with either illegal aliens or narcotics. He was especially suspicious of Ryder trucks, such as Barron-Cabrera's, which were neither towing nor driving in tandem with another vehicle. This was because, in Officer Garcia's life experience, "[n]ormally you would see a Ryder truck with the personally owned vehicle of the driver, say, in tow behind it, or there may be a husband and wife, a spouse, driving their personally owned vehicle behind it as they were moving to wherever they were going."

Officer Garcia testified that he was first able to observe Barron-Cabrera when the two vehicles were about 120 feet apart from each other. Garcia claimed that he and his partner Officer Roches then made the following observations as the cars drew closer: (1) Barron-Cabrera had a passenger in the cab of the truck; (2) Barron-Cabrera, the driver, looked at Garcia with a surprised look as the two vehicles passed; (3) Barron-Cabrera's eyes got wider after looking at the Border Patrol vehicle; (4) Barron-Cabrera then looked straight forward at the road, with both hands on the steering wheel in the 10:00 and 2:00 position; and (5) Barron-Cabrera's passenger also looked at the Border Patrol vehicle once, looked a second time, and then stared straight forward. At the speeds the two vehicles were moving, Officer Garcia would have had nine elevenths of one second to make these observations, before the two vehicles passed each other.

Officer Garcia then pulled onto the southbound shoulder of the road, to maintain surveillance of the northbound Ryder truck in his side-view mirror. As soon as Officer Garcia pulled over, however, he saw the Ryder truck hit its brake lights. He then immediately turned his Border Patrol vehicle around, and began to "tail" Barron-Cabrera's Ryder truck as it proceeded north on Highway 180. Garcia testified that as he approached the Ryder truck from behind, he and Officer Roches could see in the Ryder truck's outside mirrors that Barron-Cabrera and his

passenger were "keeping an eye" on the Border Patrol vehicle by moving their heads in jerky fashions to see into the outside mirrors.[1]

While the Border Patrol vehicle "tailed" the Ryder truck at close distance for about two miles, the Ryder truck slowed down from about 58 mph to about 45 mph (the speed limit was 55 mph). Officer Garcia also testified that, while tailing the Ryder Truck, he observed it touch both the shoulder of the road and the center line. However, he explicitly stated that he stopped the truck *not* for any traffic violation, but exclusively "[t]o ascertain whether or not they were illegal aliens."

After following the Ryder truck north on Highway 180 for about two miles, Officer Garcia pulled it over. Without Barron-Cabrera's consent, Garcia searched the truck. He found it to contain 21 illegal aliens, including Barron-Cabrera.

Barron-Cabrera was charged with two counts of transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) (1994 & Supp. 1997), and aiding and abetting in violation of 18 U.S.C. § 2 (1994). He then moved to suppress the evidence obtained in the search of the Ryder Truck on the grounds that Officer Garcia lacked reasonable suspicion to stop and search the truck. On November 2,

---

[1]Barron-Cabrera testified that he never noticed the Border Patrol unit when it was following him.

1995, after holding a brief hearing, the district court denied Barron-Cabrera's motion to suppress.[2]

Pursuant to a negotiated plea agreement, Barron-Cabrera then pled guilty to count one (8 U.S.C. § 1324(a)(1)(A)(ii)), and was sentenced to four months in prison plus two years supervised release. With the approval of the court and the consent of the government, as permitted by Fed. R. Crim P. 11(a)(2), Barron-Cabrera conditioned his guilty plea on the right to appeal the district court's denial of his pretrial motion to suppress. Barron-Cabrera now appeals the denial of his motion to suppress. The district court exercised original jurisdiction over the present case pursuant to 18 U.S.C. § 3231 (1994). We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291 (1994).

## DISCUSSION

Barron-Cabrera claims that the district court erred in two respects. First, he claims that the district court erred in crediting Officer Garcia's account of Barron-Cabrera's actions between the time Officer Garcia first observed Barron-

---

[2]The district court ruled from the bench, stating briefly its factual and legal conclusions as required by Fed. R. Crim. P. 12(e). After determining that both parties considered its statement from the bench to be sufficient, the court subsequently issued a one-paragraph Order memorializing its ruling. United States v. Barron-Cabrera, Cr. No. 95-509-HB (D.N.M. Nov. 3, 1995) (Bratton, J.) (unpublished Order). The written Order, however, contained no factual or legal analysis or conclusions.

Cabrera's Ryder truck, and the time the truck was stopped. Barron-Cabrera argues that Officer Garcia simply could not have observed everything that he testified to having observed in such a short period of time. Second, Barron-Cabrera claims that whether or not Officer Garcia's testimony is credited, the totality of the circumstances did not give rise to reasonable suspicion for the traffic stop. We address these contentions in turn.

I.

The district court's determinations of reasonable suspicion and probable cause are reviewed *de novo* on appeal. <u>Ornelas v. United States</u>, 116 S. Ct. 1657, 1663 (1996). However, its "findings of historical fact" are reviewed only for "clear error," and due weight must be given to inferences drawn from these facts by trial judges and law enforcement officers. <u>Id.</u> Further, "[w]hen reviewing the denial of a motion to suppress evidence, we view the evidence in the light most favorable to the government and [to] the district court's findings." <u>United States v. Anderson</u>, 114 F.3d 1059, 1063 (10th Cir. 1997).

In the present case, the district court credited Officer Garcia's testimony, and thereby found that the factual events at issue occurred as Officer Garcia described them. The court's finding in this regard is a "finding of historical fact" which we review only for "clear error."

In Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985), the

Supreme Court specifically discussed the issue of when an appellate court must

defer to a trial court's credibility determinations. According to the Anderson

court,

> When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decisions whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

470 U.S. at 575 (citations omitted).

In the present case, Barron-Cabrera specifically attacks the district court's

finding that Officer Garcia's testimony regarding the stop itself was credible. In

regard to that testimony, the district court stated the following:

> as far as actually the stop, as I say, I find the agent's testimony was credible. I do find that he had--he viewed the vehicle coming towards him and he slowed down. He did not have much time. Unquestionably, *it's a matter of seconds*, a very limited time to make the observations; *but I think he did have sufficient time to make the*

*observations to which he testified*, that the person looked at him. He had enough vision of the driver's face that he thought he had a--as he called it, a surprised or scared expression, and then turned back immediately, gripping the wheel firmly and looking straight ahead; and the agent testified he has seen that same expression before, on people who are smuggling.

Transcript of Proceedings on Defendant's Motion to Suppress Physical Evidence and Statements, No. CR 95-509 HB, at 65-66 (D.N.M. Nov. 2, 1995) (Bratton, J.) (emphasis added).

While the district court apparently believed that Officer Garcia had "seconds" in which to make the observations he reported, Officers Garcia and Roches in fact had only *nine-elevenths of one second* to observe Barron-Cabrera and/or his passenger exhibit "surprised or scared" facial expressions, widen their eyes, look back to watch the Border Patrol vehicle go by, return to looking straight forward with both hands gripping the steering wheel, look a second time, and then stare straight forward again.[3] In essence, Barron-Cabrera argues that the district court would not have credited Officer Garcia's testimony if it had

---

[3]Officer Garcia testified that he was traveling southbound at 45 mph, that Barron-Cabrera was traveling northbound at 55 mph, and that Garcia was first able to observe Barron-Cabrera and his companion from a distance of 120 feet. Accepting these numbers as true, the two cars were traveling towards each other at a relative speed of 45+55=100 mph, at which speed 120 feet would be traversed in 9/11 of one second. Officer Garcia may have had slightly more time than that because he testified he was decelerating from 45 mph.

correctly computed the time available to Officer Garcia to make his reported observations. We disagree.

While nine-elevenths of a second is in many respects a short duration of time, we note that it is nearly *twice* the interval in which a major-league baseball batter must observe the trajectory of an approaching pitch, determine what kind of pitch it is, decide whether or not to swing at it, and then, if indicated, swing his bat into a proper position to hit the ball. We recognize, of course, that Officer Garcia is not a major-league baseball player. However, nine-elevenths of a second is roughly the interval in which a *high-school* baseball player must complete the same calculations. Further, Officer Garcia could draw upon three-and-a-half years of experience at observing the reactions of motorists in helping him decipher what he was quickly observing.

In addition, we reiterate that the district court expressly found that Officer Garcia was "a credible witness" generally, and also that "the agent's testimony was credible" with respect to the particular stop at issue. Here, we cannot say that Officer Garcia's testimony was so implausible on its face that no reasonable trier of fact would have credited it. We therefore hold that the district court did not commit clear error when it credited Officer Garcia's factual account of the events leading up to the traffic stop.

II.

Barron-Cabrera further claims that even if Officer Garcia's factual testimony is credited, the totality of the circumstances did not give rise to reasonable suspicion for the traffic stop. We review the district court's determination of reasonable suspicion *de novo*. Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996).

A routine traffic stop is a seizure under the Fourth Amendment. United States v. Anderson, 114 F.3d 1059, 1063 (10th Cir. 1997) (citing United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc), cert. denied, 116 S. Ct. 2529 (1996)). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Section 287(a)(3) of the Immigration and Nationality Act of 1952, on the other hand, authorizes Border Patrol agents, without warrant,

> within a reasonable distance[4] from any external boundary of the
> United States, to board and search for aliens any . . . vehicle . . . for

---

[4]Under current regulations, the term "reasonable distance" has been defined to mean "within 100 air miles from any external boundary of the United States. . . ." 8 C.F.R. § 287.1(a)(2) (1997). It is undisputed that the traffic stop in the present case took place about 45 miles from the Mexican border.

- 11 -

the purpose of patrolling the border to prevent the illegal entry of aliens into the United States.

8 U.S.C. § 1357(a)(3) (1994 & Supp. 1997) (footnote added). Further, without any geographic limitation, Section 287(a)(1) authorizes Border Patrol agents "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1) (1994).

In United States v. Brignoni-Ponce, 422 U.S. 873 (1975), the Supreme Court reconciled the seemingly incompatible mandates of the Fourth Amendment and Section 287(a) of the Immigration and Nationality Act of 1952 by limiting the reach of Section 287(a). Specifically, the Court announced that "the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, [and] also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." Id. at 884. Thus, the Court held, "[e]xcept at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." Id.

By casting the required inquiry in terms of "reasonable suspicion," the Brignoni-Ponce Court reinforced its holding that courts should apply the "investigative detention" principles of Terry v. Ohio, 392 U.S. 1 (1968), when

- 12 -

analyzing immigration-related vehicle stops conducted near the border by Border

Patrol officers. See Brignoni-Ponce, 422 U.S. at 880-82 (discussing nature,

purpose, and parameters of a "Terry stop"); accord United States v. Anderson,

114 F.3d 1059, 1063 (10th Cir. 1997) ("Because a traffic stop is constitutionally

analyzed as an investigative detention, requiring reasonable suspicion of criminal

activity, as opposed to a full custodial arrest requiring probable cause, the

principles of Terry v. Ohio apply.") (citing Terry, 392 U.S. at 19-20).

In the period since Brignoni-Ponce was decided, a large body of case law

has addressed the question of when a Border Patrol officer on roving patrol has

"reasonable suspicion" sufficient to allow the officer to stop a vehicle suspected

of violating the immigration laws, without running afoul of the Fourth

Amendment. We recently summarized the main thrust of this case law as follows:

> Border patrol agents on roving patrol may stop vehicles only if they
> are aware of specific articulable facts, together with rational
> inferences from those facts, that reasonably warrant suspicion that
> those vehicles' occupants may be involved in criminal activity. Any
> number of factors might contribute to an agent's decision to stop a
> vehicle on reasonable suspicion. The law does not specify a
> minimum number of factors necessary to constitute reasonable
> suspicion or any outcome determinative criteria. Each case turns
> upon its own facts. In all instances, however, the agent is entitled to
> assess the facts in light of his experience in detecting criminal
> activity. Law enforcement officers may perceive meaning in actions
> that appear innocuous to the untrained observer. This is not to say
> that an agent may stop a vehicle on an unparticularized suspicion or
> hunch. While the necessary level of suspicion is considerably less
> than proof of wrongdoing by a preponderance of the evidence, the

Fourth Amendment requires some minimal level of objective justification.

United States v. Cantu, 87 F.3d 1118, 1121 (10th Cir.), cert. denied, 117 S. Ct. 265 (1996) (internal citations and quote marks omitted).

In United States v. Brignoni-Ponce, 422 U.S. 873, 884-85 (1975), the Supreme Court articulated a non-exhaustive, multi-factor test to guide our "totality of the circumstances" inquiry. We have summarized this test as follows:

> In determining whether there is reasonable suspicion to stop a car in the border area, officers may consider any number of factors, including: (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

United States v. Lopez-Martinez, 25 F.3d 1481, 1483-84 (10th Cir. 1994) (quoting United States v. Monsisvais, 907 F.2d 987, 990 (10th Cir.1990), appeal after remand, 946 F.2d 114 (10th Cir. 1991) (citing Brignoni-Ponce, 422 U.S. at 884-85)).

We have noted that "[n]either Brignoni-Ponce nor its progeny identify a minimum number of factors necessary to constitute reasonable suspicion or any outcome determinative criteria. Indeed, such an approach would be antithetical to a totality of the circumstances inquiry." Lopez-Martinez, 25 F.3d at 1484.

- 14 -

Applying the Brignoni-Ponce factors, sometimes we have upheld the findings of "reasonable suspicion" to uphold vehicle stops near the border. See, e.g. United States v. Cantu, 87 F.3d 1118, 1122-23 (10th Cir.), cert. denied, 117 S. Ct. 265 (1996); United States v. Lopez-Martinez, 25 F.3d 1481, 1485-87 (10th Cir. 1994); United States v. Martin, 15 F.3d 943, 950-51 (10th Cir.), aff'd on reh'g in part, 18 F.3d 1515 (10th Cir.), cert. denied, 513 U.S. 868 (1994); United States v. Barbee, 968 F.2d 1026, 1029 (10th Cir. 1992); United States v. Pollack, 895 F.2d 686, 690 (10th Cir.), cert. denied, 498 U.S. 985 (1990). Other times, we have concluded that the government lacked "reasonable suspicion" to make the stop in question. See, e.g. United States v. Martinez-Cigarroa, 44 F.3d 908, 909-11 (10th Cir.), cert. denied, 115 S. Ct. 1386 (1995); United States v. Peters, 10 F.3d 1517, 1519, 1521-22 (10th Cir. 1993); United States v. Venzor-Castillo, 991 F.2d 634, 635-36 (10th Cir. 1993); United States v. Guillen-Cazares, 989 F.2d 380, 383 (10th Cir. 1993); United States v. Miranda-Enriquez, 941 F.2d 1081, 1083-84 (10th Cir. 1991); United States v. Monsisvais, 907 F.2d 987, 990-92 (10th Cir. 1990), appeal after remand, 946 F.2d 114 (10th Cir. 1991).

The Supreme Court has cautioned that "because the mosaic which is analyzed for a reasonable-suspicion or probable-cause inquiry is multi-faceted, one determination will seldom be useful precedent for another." Ornelas v. United States, 116 S. Ct. 1657, 1662 (1996) (quoting Illinois v. Gates, 462 U.S.

- 15 -

213, 238 n.11 (1983)) (internal quote marks omitted); accord United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994) ("our roving 'border patrol stop cases are fact driven and must be considered on a case-to-case basis'") (quoting United States v. Martin, 15 F.3d 943, 950 (10th Cir.), aff'd on reh'g in part, 18 F.3d 1515 (10th Cir.), cert. denied, 513 U.S. 868 (1994)). Thus, we proceed to analyze the facts of the present case in light of the non-exhaustive multi-factor test set forth in Brignoni-Ponce.

In the present case, Barron-Cabrera was stopped in a lightly trafficked area, "reasonably near" the border as defined by 8 C.F.R. § 287.1(a)(2) (1997). The district court found "evidence of alien trafficking in that area and using that road." It further found that the amount of such alien trafficking had gone up significantly from the previous year, and that this stretch of Highway 185 enabled aliens to avoid permanent checkpoints that were located on other north-south roads in the area. Although Deming, a town of 15,000, was located between the stop location and the border, the government's characterization of Highway 185 as passing through a "rural and barren landscape" containing "a few farms" with very little mid-day traffic from local residents appears adequately supported in the record. Thus, we find that the first three Brignoni-Ponce factors were all satisfied.

With respect to the fourth factor, the previous experience of the agent with alien traffic, Officer Garcia testified to having been a Border Patrol agent for 3½ years, during the most recent three of which he was assigned to the Deming, New Mexico Border Patrol station. He also testified that he normally and routinely patrolled the section of Highway 180 where he stopped Barron-Cabrera's Ryder truck, and that he received daily information from the Border Patrol's Intelligence Office in El Paso, Texas. (Id. at 24). Officer Garcia testified that the Deming Border Patrol station as a whole had made 1,218 apprehensions of aliens during the month of August, 1995, and that four of those apprehensions (involving 32 illegal aliens) had been made by Officer Garcia's North County Unit--which consisted of only three officers--on the precise stretch of Highway 180 where Barron-Cabrera was stopped. Officer Garcia further testified that he had interdicted "groups of aliens being smuggled commercially," and that the drivers of the interdicted vehicles had given him the same "surprised" look that Barron-Cabrera gave him. Construing this testimony in the light most favorable to the government, we conclude that Officer Garcia established sufficient previous experience with alien traffic to satisfy the fourth prong of the Brignoni-Ponce test.

The government concedes that Officer Garcia had received no information about recent illegal border crossings in the area , and thus did not satisfy the fifth Brignoni-Ponce factor.

As discussed in Part I, *supra*, the sixth factor, pertaining to the driver's behavior (including any obvious attempts to evade officers), was at least partially demonstrated. The district court credited both Officer Garcia's account of Barron-Cabrera's body language upon catching sight of the Border Patrol vehicle, and Officer Garcia's testimony that similar body language was often exhibited by smugglers in similar situations. Further, Barron-Cabrera tapped his brakes when Officer Garcia turned around and began tailing him, something that the district court thought "adds a little bit to the Government's case; not much." Finally, after noticing that Officer Garcia had made a U-turn to follow him, Barron-Cabrera drove the Ryder truck over both the shoulder line and the center line of Highway 180, indicating to Officer Garcia that Barron-Cabrera had become nervous. In our view, these facts partially satisfy the "driver's behavior" prong of Brignoni-Ponce.

On the other hand, Officer Garcia also clearly testified that Barron-Cabrera made no attempt to evade Officer Garcia. Thus, the government relies wholly on Barron-Cabrera's nervous appearance to satisfy this prong. We have said, however, that "[w]hile a person's nervous behavior may be relevant, we are wary

of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials. . . ." United States v. Peters, 10 F.3d 1517, 1521 (10th Cir. 1993) (ellipses in original) (quoting United States v. Hall, 978 F.2d 616, 621 n.4 (10th Cir. 1992)). For this reason, we cannot say that the "driver's behavior" prong of Brignoni-Ponce was wholly satisfied in the present case.

Finally, the seventh and eighth factors from Brignoni-Ponce pertain to the "aspects" or characteristics of the vehicle (such as a station wagon with concealed compartments), and to the appearance that the vehicle is heavily loaded. These factors blend together in the case of a Ryder truck. Because a Ryder truck is designed to carry heavy cargo in a windowless trailer, its appearance does not necessarily vary when it is heavily loaded, and its cargo may be concealed without the use of "concealed compartments." For these reasons, the government argues that "[a] Ryder truck makes an ideal alien smuggling vehicle due to the fact that it is capable of carrying a large number of persons without detection from an outside observer and without appearing to be heavily loaded."

While we largely agree with the government's assessment of the utility of a moving truck as an alien smuggling vehicle, we cannot accept any *per se* rule allowing a Ryder truck automatically to satisfy the seventh and eighth prongs of Brignoni-Ponce. In the present case, however, Officer Garcia's suspicion was

- 19 -

predicated on more than just the mere fact that Barron-Cabrera was driving a Ryder truck 45 miles from the border. Rather, Officer Garcia also articulated two additional reasons why he believed that the particular Ryder truck at issue was not being used for legitimate moving purposes.

First, in Officer Garcia's experience, people using Ryder trucks to move from one home to another normally towed their personal vehicles or drove them in tandem with the truck. Barron-Cabrera's Ryder truck was accompanied by no such personal vehicle, indicating to Officer Garcia that it was not being used for a household move. Second, Officer Garcia was familiar with the sparsely populated area along Highway 180, and knew that people very rarely moved in or out of that area. The presence of a Ryder truck in such an area, on a road that is not a through route to any more populous area, added to the reasonableness of Officer Garcia's suspicion that the truck was being used for an illegal purpose. In this regard, we think that a Ryder truck can satisfy the seventh and eighth prongs of Brignoni-Ponce more readily where, as here, it is observed in an unlikely location, then when it is observed, for example, on an interstate highway or in a metropolitan area, where such trucks are more commonly observed being used for legitimate purposes.

In sum, the "totality of the circumstances" in the present case amount to this: Barron-Cabrera and a companion were driving: (1) a Ryder truck

unaccompanied by another vehicle towed or driving in tandem; (2) on Highway 180, a lightly traveled road rarely used for household moves; (3) which was reasonably near the Mexican border; (4) which was a known smuggling corridor which bypassed every permanent border checkpoint in the vicinity; and (5) upon which four vehicles carrying 32 aliens had already been apprehended within the same month. When Barron-Cabrera spotted a Border Patrol vehicle, (6) he became noticeably agitated; (7) he tapped on his brakes and slowed to nearly ten miles per hour below the speed limit; (8) he drove over the center line and the shoulder line; and (9) he drove in a stiff manner which Officer Garcia had observed other smugglers assume when tailed by a law enforcement vehicle. In our opinion, these factors, considered as a whole, establish sufficient reasonable suspicion to support Officer Garcia's traffic stop.

We therefore AFFIRM the Order of the district court denying Barron-Cabrera's Motion to Suppress Physical Evidence and Statements.