**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 20 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

REFUGIO GOMEZ-ESPINOZA;
MAX MENDOZA,

Defendants - Appellants.

No. 97-2302 & 97-2321
(D. Ct. Nos. CR-96-610-BB)
(D. N. Mex.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, **BALDOCK**, and **KELLY**, Circuit Judges.

---

Following their indictments for conspiracy and possession with intent to distribute more than 100 kilograms of marijuana, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846, the defendants separately moved to suppress the marijuana that United States Border Patrol agents discovered in the gas tanks of four pickups the defendants and others were driving near the New Mexico-Mexico border.  The district court denied their motions.  The defendants

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

subsequently pleaded guilty while reserving their right to appeal the denial of their motions to suppress. They pursue that appeal here. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

The sole question presented by this appeal is whether the district court properly held that Border Patrol agents had reasonable suspicion to stop a convoy of four nearly identical pick-up trucks near the New Mexico-Mexico border.

On September 28, 1996, Border Patrol Agent Jose Alvarado was traveling northwest along I-10 from El Paso, Texas to Las Cruces, New Mexico. Agent Alvarado had been stationed in Las Cruces for about six years. During that time, he made at least 80 drug arrests. Just south of Las Cruces, I-10 turns due west towards Arizona and California. At that point, I-25 begins and continues the northbound path that I-10 follows from El Paso toward Las Cruces. There are permanent Border Patrol checkpoints on both I-25 north of Las Cruces and I-10 west of Las Cruces that lie in the territory that Agent Alvarado patrols. Because the I-10 checkpoint is often unmanned, I-10 is commonly used by drug smugglers to circumvent the more frequently manned checkpoint along I-25.

At about 1:00 p.m., approximately five miles south of Vado, New Mexico, Agent Alvarado spotted two pick-up trucks traveling northwest along I-10 toward Vado. Vado is about fifteen miles north of the border and about ten miles south of Las Cruces. The first truck was a tan Chevrolet pick-up truck with California

license plates. In front of the tan truck was a similar white Chevy pick-up also with California plates. According to Agent Alvarado's testimony, Chevy pick-up trucks are commonly used to smuggle drugs through checkpoints. He suspected that the two trucks were traveling in tandem. He also suspected that the first truck was acting as a "scout" for the second one. According to Agent Alvarado, drug smugglers often use "scout cars" to determine whether checkpoints are manned or if a drug-sniffing dog is present. The scout then advises the driver of the cars loaded with contraband (i.e., the load cars) to proceed into the checkpoint, sit and wait, or turn around.

The two trucks stayed together, keeping a constant distance of five to seven car lengths between them. According to Agent Alvarado, drug smugglers often keep such distances from each other so as not to draw attention to themselves. At the point where I-10 and 1-25 meet, both trucks headed westbound on I-10. Agent Alvarado continued to follow the trucks, "suspect[ing] that if the vehicles indeed were carrying contraband, that they would exit at the Love's exit, a truck stop." Tr. at 41. The Love's truck stop is located in a remote desert area outside of Las Cruces, approximately twelve miles east of the I-10 checkpoint, and about thirty miles west of Vado. According to Agent Alvarado's testimony, Love's is a common staging area used by smugglers to leave vehicles loaded with drugs while a scout car goes to the checkpoint to see whether it is manned. At the truck stop,

both vehicles gassed up. Agent Alvarado noted that drug smugglers commonly hide drugs in gas tanks, thus limiting the amount of gas their tanks can hold and requiring them to refuel frequently. After refueling and parking their cars, the drivers of the two trucks walked over to a third Chevy pick-up truck. The drivers of the three trucks talked to one another. Soon thereafter, a fourth Chevy pick-up pulled into the parking lot. This truck was white and had Chihuahua, Mexico license plates. According to Agent Alvarado, the driver "squealed his tires as he came to a halt." Tr. at 46, 102, 107. He then walked over to where the other drivers were talking and he gestured to them to follow him. Agent Alvarado testified that he thought the fourth truck could have just completed a scouting run to the I-10 checkpoint.

Agent Alvarado radioed for backup and followed behind two of the trucks. The other two pick-up trucks drove behind him. Approximately 40 miles west of the Love's truck stop, at mile marker 93, Agent Alvarado stopped the two trucks that he was following. He was soon joined by back-up units, one of which then left in pursuit of the remaining two Chevys. Defendant Gomez-Espinoza was the driver of one of the two vehicles that Agent Alvarado had stopped.

Five miles down the road, at mile marker 88, New Mexico State Police Officer Robert Santana stopped the other two trucks, one of which Defendant Max Mendoza was driving. Officer Santana had with him a drug-sniffing dog.

- 4 -

Mendoza and the driver of the other truck consented to have Officer Santana inspect their trucks with the dog. The dog alerted to the gas tanks of both trucks. Soon thereafter, Agent Alvarado arrived at mile marker 88 with the first two trucks that had been stopped and their occupants. Defendant Gomez-Espinoza consented to have his truck inspected by the dog, which alerted to the gas tank.

The agents placed the defendants under arrest and searched the trucks. They discovered a total of 546 pounds of marijuana hidden within the gas tanks of the four trucks.

The defendants separately moved to suppress the marijuana on the ground that the agents lacked reasonable suspicion to stop them. The district court denied their motions, ruling from the bench. In reviewing a decision on a motion to suppress, we review the district court's ultimate determination about reasonable suspicion *de novo*, though we review the court's factual findings for clear error, giving due weight to the inferences drawn therefrom by the district court. See United States v. Barron-Cabrera, 119 F.3d 1454, 1457 (10th Cir. 1997). We view the evidence in the light most favorable to the district court's findings. See id.

It is well established law that border patrol agents on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with the rational inferences therefrom, that reasonably warrant suspicion that the vehicles

are involved in criminal activity. See United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975); United States v. Martinez-Cigarroa, 44 F.3d 908, 910 (10th Cir. 1995). To determine whether a stop was based on reasonable suspicion, we employ a totality-of-the-circumstances approach. See United States v. Sokolow, 490 U.S. 1, 8 (1989). Under that approach, we consider whether the articulated facts in the aggregate support the stop. See id. at 9. Even if each fact alone is not proof of illegal activity, when considered together, the facts may nonetheless amount to reasonable suspicion. See id. The issue here, then, is whether Agent Alvarado's rational inferences from all the facts he had before him justified his decision to pull over the trucks.

Border patrol agents may properly consider the following factors in determining whether there exist facts that reasonably warrant suspicion of criminal activity: (1) the physical characteristics of the geographic area in which the vehicle is stopped, (2) traffic patterns on the road, (3) proximity to the border, (4) previous experience with illegal activity in the area, (5) information about recent border crossings, (6) attempts to evade detection, (7) appearance of the vehicle, (8) appearance and behavior of the driver and passengers, and (9) other relevant information. See United States v. Pollack, 895 F.2d 686, 690 (10th Cir. 1990) (quoting United States v. Lebya, 627 F.2d 1059, 1062-63 (10th Cir. 1980)). Given these factors and this circuit's caselaw, and considering the facts with

which Agent Alvarado was faced and his many years experience in the field, we agree with the district court that under the totality of the circumstances, the stop of the Chevy trucks was based upon reasonable suspicion. The facts here are not appreciably less suspicious than those presented in United States v. Pollack, United States v. Cantu, 87 F.3d 1118 (10ᵗʰ Cir. 1996), or United States v. Leos-Quijada, 107 F.3d 786 (10ᵗʰ Cir. 1997).

For example, in Pollack, we held that border patrol agents had reasonable suspicion to stop the driver of a suspected load car. There, the driver of a pick-up truck came through a border patrol checkpoint along I-25 early in the morning and asked for directions to the nearest filling station. Forty-five minutes later, agents detected the pick-up on another highway traveling close to a Buick sedan that seemed to be riding low in the rear. The highway was seldom traveled and it circumvented the border patrol checkpoint on I-25. After agents stopped both vehicles, they searched and found marijuana in the trunk of the Buick. See Pollack, 895 F.2d at 692.

In this case, each fact taken alone seems relatively innocent. Taken together, however, the conduct of the four pick-up trucks breeds suspicion. Most suspicious was the fact that four, nearly identical, out-of-state Chevy pick-up trucks *rendez-vous*ed at a desert truck-stop only ten miles east of a border patrol checkpoint. When the fourth pick-up arrived at Love's truck-stop, the driver

rounded up the other drivers and they quickly headed west on I-10 towards the checkpoint. Agent Alvarado recognized this *rendez-vous* as characteristic of scouting activity used in smuggling contraband. Furthermore, pick-up trucks are often used, because of their size, to smuggle drugs. The truck stop where all the trucks stopped is reportedly known to be a frequent meeting place for drug and alien smugglers, and the entire geographic area just north of the Mexican border is known for extensive alien and drug smuggling. Agent Alvarado had observed the first two pickups during his drive from El Paso, along the Mexican border. Agent Alvarado testified that most of the drugs smuggled into southern New Mexico come from Juarez, a Mexican city just across the border from El Paso. Indeed, one of the four trucks had Mexican license plates. All of the pickups drove a stretch of highway known for its limited traffic and known as an avenue to bypass the more frequently manned checkpoint on I-25. These factors, when considered in the aggregate, gave rise to a reasonable suspicion justifying stopping the four trucks.

AFFIRMED.

ENTERED FOR THE COURT,

Deanell Reece Tacha
Circuit Judge