**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 27 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellant,

v.

LANCE PECK and BELINDA PECK,

      Defendants-Appellees.

No. 97-8122
(D.C. No. 96-CR-38-D)
(District of Wyoming)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO** and **ANDERSON**, Circuit Judges, and **CAMPBELL**, District Judge[**]

The government appeals the district court's order suppressing evidence and statements by defendants Lance and Belinda Peck in which they purportedly admitted having illegally taken government property. The government contends the court erred in finding no probable cause to search the Pecks' car and the circumstances surrounding the

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable Tena Campbell, United States District Judge for the District of Utah, sitting by designation.

questioning created a custodial environment triggering the need to give *Miranda* warnings. Upon our examination of the record, we cannot agree with either of the district court's conclusions. We reverse and remand for further proceedings.

The facts of this matter are well known to the parties; therefore, we shall not dwell upon them here except when necessary to clarify our reasoning. Suffice, then, the matter arises out of a somewhat protracted investigation of the illegal removal of invertebrate fossils from the 18 Mile Canyon area of southwestern Wyoming. During the course of the investigation, government officers developed information about Brian Wade which led to the conclusion he was the prime suspect in this offense. Wade was a known felon who carried a firearm and had been in a recent altercation in which weapons were displayed. Wade had also made public threats toward one of the investigating officers.

Acting on information from his ex-wife that Wade was planning to go back to the canyon, Rangers Sauer and Hurlock and Agents Miller and Vernon decided to watch both the suspect and the site where fossils had been removed. Wade was subsequently seen loading lanterns and boxes into a small, white Toyota pickup and later driving past the BLM offices toward the canyon. Agent Vernon and Ranger Hurlock followed the pickup. In the meantime, Agent Miller, already stationed in the canyon, walked over the hill, saw lights, and heard voices and digging sounds (metal on rock) at the dig site. Although he could not distinguish voices, he heard several and saw lanterns set down into the hole.

Around 4:30 a.m., Agent Miller saw the lanterns being moved and alerted the others he thought the diggers were packing up to leave. To his surprise, although he had only seen one car come in, two sets of headlights appeared; one turned north toward Ranger Hurlock and the other south toward Ranger Sauer and Agent Vernon. Agent Miller then joined Ranger Hurlock who was without back-up.

Agent Vernon spotted the car which continued south past Ranger Sauer who began to follow with his headlights off. Over the radio, Ranger Hurlock told him he was following the white pickup they had observed being loaded with lanterns and gear. When Ranger Sauer noticed the car he was tailing suddenly accelerate, he turned on his lights and continued to follow until Agent Vernon caught up with him about twenty miles from the canyon.[1]

Together, having previously chosen a strategy, Agent Vernon and Ranger Sauer prepared to execute a "felony" or "high risk" stop, believing Brian Wade was in the car they were following and concerned about the dark and isolated location of the encounter. Ranger Sauer activated his emergency lights, and the targeted car stopped. Ranger Sauer pulled up along the driver's side with his and Agent Vernon's high beams and a spotlight illuminating the area. Stepping out of their vehicles with their guns drawn and pointed at the stationary car, they announced over their public address system they were federal

---

[1]The government states Ranger Sauer and Agent Vernon were out of radio contact with Agent Miller and Ranger Hurlock so didn't know what had happened in that pursuit of the white pickup.

agents and ordered the passengers of the car to put their hands out of their windows where they could be seen. Ranger Sauer then instructed the driver, Lance Peck, to reach in and remove the keys with his left hand and place them on the windshield. Ranger Sauer ordered Mr. Peck to reach down, open the door, and step out. Once out, Ranger Sauer told him to lift his shirt slowly and turn around. As he turned, Ranger Sauer thought he saw a holster on Mr. Peck's right side, so he commanded over the PA, "I see your holster. If you reach for it, we'll have to shoot. Do you understand?" Ranger Sauer then ordered Mr. Peck to turn around again, back up, and kneel on the ground with his hands up and head down. Agent Vernon, also with his gun still drawn and pointed, walked up to Mr. Peck and handcuffed him.

While handcuffing him, Agent Vernon told Mr. Peck he was not under arrest and would be released after the scene was secured. Responding to the officers' questions, Mr. Peck stated he had two guns in his car, which Ranger Sauer retrieved, unloaded, and placed on the hood of the truck. The officers then walked Belinda Peck through the same exit sequence having her lift her shirt but not handcuffing her.[2] After Ms. Peck said a child was asleep in the backseat of the car, Agent Vernon told her they were investigating the theft of fossils from the canyon. In the meantime, Ranger Sauer conducted a sweep of the defendants' vehicle, using "quick peeks with his gun still drawn." About ten minutes

---

[2]The parties dispute whether Ms. Peck had to kneel with her hands behind her. The district court, however, found the officers more credible and concluded she did not kneel on the ground.

had passed from the start of the encounter to this point. There is disputed evidence whether officers had removed the handcuffs from Mr. Peck, but the district court found they had.

Ranger Sauer then told Mr. Peck the officers were investigating the theft of fossils from the canyon and the Pecks were observed leaving that area. Ranger Sauer asked Mr. Peck what he was doing there, and he answered he was digging fossils and did not have a permit. At the officers' request, Mr. Peck removed several boxes of fish and turtle fossils from the back of his car. Meanwhile, Agent Vernon told Ms. Peck the couple was not under arrest. She also stated they were digging fossils but said they dug leaf fossils. The agents photographed the fossils, took down the Pecks' name and address, and handed them a receipt for the tools and fossils. Sent on their way, the couple drove off.

Lance and Belinda Peck were indicted on one count of theft of government property and aiding and abetting. 18 U.S.C. §§ 641 and 2. The Pecks filed a motion to suppress, and after a hearing, the court made an exceptionally thorough written ruling.

In its order, the court detailed the facts to which we have referred, indicating in each area of dispute it found the government agents more credible and indulged all inferences in their favor. Based on all of these circumstances, the court held the officers had "reasonable suspicion" to believe the "persons in the Peck vehicle had been engaged in criminal activity." However, while the officers could execute a *Terry* stop, the district court believed the same information was insufficient to establish probable cause. Next,

the court alined this case with ***United States v. Perdue***, 8 F.3d 1455 (10th Cir. 1993), in which we held ***Miranda*** rights can be implicated during a valid stop when the police employ highly intrusive and coercive tactics to detain the individual.

The court cited Ranger Sauer's testimony that although the Pecks were not under arrest, they would not have felt free to leave under the circumstances. Relying on ***United States v. Mendenhall***, 446 U.S. 544 (1980), the court found a reasonable person in the Pecks' place would not have felt free to leave. While underscoring the officers acted properly under the circumstances, the court apparently believed it was constrained by ***Perdue***. We shall deal with each ruling in turn.

We review *de novo* the district court's determination of probable cause, ***Ornelas v. United States***, 517 U.S. 690, 695 (1996), 116 S. Ct. 1657, 1662, while reviewing its findings of historical fact for clear error. ***United States v. Barron-Cabrera***, 119 F.3d 1454, 1457 (10th Cir. 1997). What constitutes probable cause is not subject to a precise determination, but rather is determined by "commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.'" ***Ornelas***, 517 U.S. at ____, 116 S. Ct. at 1661 (quoting ***Illinois v. Gates***, 462 U.S. 213, 231 (1983)) (internal quotation marks omitted). The Court, however, has described the existence of probable cause as "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." ***Id.***, citing ***Brinegar v.***

*United States*, 338 U.S. 160, 175-76 (1949).  Looking at the facts known to the officers upon their encountering the defendants within our *de novo* scope of review, we believe they had probable cause to search the defendants' vehicle.

In addition to those facts relied upon by the district court to support its conclusion the officer's had reasonable suspicion, additional facts should have been noted by the court that indicate reasonable and prudent officers would have believed evidence of contraband would be found in the car.

The 18 Mile Canyon area is a wilderness in which the most frequent activity is the removal of vertebrate fossils.  Although other legal activity may also take place there, common sense tells us the late hour and the surreptitious nature of the conduct of the people digging that night suggest their intent was not likely to be lawful.  The lack of human habitation in the area immediately calls into question late night activities accomplished in lantern light and accompanied by the clink of metal on stone, particularly when the locus of that activity is the long known site of illegal fossil harvesting.  Moreover, it is not beyond the pale of prudence and common sense that a vehicle making a pre-dawn exit from the site in which that clandestine conduct occurred would contain the fruits of the nocturnal harvest.

We conclude the officers had probable cause to believe it likely the defendants' car contained contraband.  It therefore follows they not only were justified in doing so, but also had probable cause to proceed against the defendants in their chosen manner.

That brings us to consideration of whether the court erred in applying ***Perdue***. We review this issue under the same standard employed in determining whether there was probable cause, applying clear error to the court's findings of fact and *de novo* review to its conclusion of law. ***United States v. Fernandez***, 18 F.3d 874, 876 (10th Cir. 1994). Using that frame of reference, we think the district court did err because it did not take into consideration the release of Mr. Peck from his handcuffs and the statements made to him that he was not under arrest. The court did not seem to appreciate the significance of the lack of any restraint of Ms. Peck. These circumstances must be put into context with the fact the officers acted properly and without undue force in stopping defendants' car and ordering them from the vehicle under gun point. Moreover, once they found there was no reason to be concerned with their safety, the officers eliminated all physical restraint from Mr. Peck. At the point at which the questioning commenced, neither defendant was physically constrained in any fashion.

Although the district court found the force employed by the officers was reasonably necessary for their safety, it nonetheless concluded that force required the officers to advise the defendants of their ***Miranda*** rights before asking further questions. The court heavily relied upon the testimony of Ranger Sauer that the defendants would not have felt free to leave and, consequently, they were compelled to respond to questioning.

The record, however, indicates the defendants had been told they were being restrained only until the area was secured;[3] Lance Peck was standing and not manacled when he was asked why he was in 18 Mile Canyon, and the officers had holstered their weapons. In short, based upon the facts as found by the district court, we see none of the coercive factors that precipitated *Perdue*.

We think this case is quite like *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994). Like the court in *Ritchie*, we do not believe the defendants were in custody at the time they were questioned. They were free of the restraints imposed upon them for reasons of the officers' safety and in no way under physical force or duress. They had been clearly advised they were not under arrest and were allowed to return home after the officers secured the contraband that was in the defendants' car. The totality of these circumstances leads us to conclude defendants failed to demonstrate the applicability of the *Miranda* paradigm. *Id*.

The judgment of the district court is **REVERSED**, and the cause is **REMANDED** for further proceedings.

ENTERED FOR THE COURT

John C. Porfilio
Circuit Judge

---

[3]The fact both defendants were released and permitted to go home after the interview was completed lends substance to the officers' statements.