United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 8, 2004**

Charles R. Fulbruge III
Clerk

I n the
United States Court of Appeals
for the Fifth Circuit

_____

m 04-30205
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JOSEPH LEE JACKSON,

Defendant-Appellant,

_____

Appeal from the United States District Court
for the Western District of Louisiana

_____

Before SMITH and GARZA, Circuit Judges,
and VANCE,[*] District Judge.

JERRY E. SMITH, Circuit Judge:

Arrested after being found in a Greyhound bus station with cocaine strapped to his waist, Joseph Jackson was charged with possession of cocaine with intent to distribute. After his

_____

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

motion to suppress was denied, he entered a conditional guilty plea. He now appeals the denial of the motion to suppress. Concluding that Jackson's Fourth Amendment rights were not violated, we affirm.

I.

In the morning hours of May 23, 2003, a bus traveling from Dallas, Texas, pulled into the Greyhound bus station in Shreveport, Louisiana, for a stop scheduled to last approximately thirty minutes. Two plain clothes of-

ficers, Sergeant Kevin Dunn and Deputy James McLamb, with their weapons concealed, approached the driver as the bus doors opened and asked permission to search the vehicle for illegal narcotics. The driver agreed.

Dunn boarded the bus and announced over the intercom that he was a narcotics officer and that he would be bringing a drug-sniffing dog onto the bus to search for drugs. Standing near the driver's seat, and out of the way of the aisle, Dunn advised the passengers that they could either remain on the bus during the search or depart before the dog was brought aboard. The passengers were further advised that they could either leave their carry-on bags on the bus or take them as they departed. In the event any passengers were unable to exit the bus on their own, they were advised that if they did not choose to remain on the bus they could receive assistance in exiting. All the passengers chose to disembark.

As the passengers exited, Dunn noticed one passenger, Jackson, acting in a manner Dunn regarded as nervous: He was standing "exceptionally straight"; "his eyes were very wide open"; his posture was "unusually straight"; and he stepped quickly off the bus, avoiding eye contact and not responding when Dunn said "Good morning." Once the passengers had exited, McLamb boarded with the dog and searched the passenger compartment. The dog alerted on an empty seat and two bags stowed above the seat,[1] so McLamb suspected that someone was "body-carrying" drugs. The

search now complete, McLamb communicated to Dunn his suspicion that a passenger might be carrying drugs; McLamb placed the dog back in the police vehicle.

Dunn entered the station and noticed Jackson in the restaurant area.[2] Jackson looked nervous, was sweating heavily, and appeared to be having difficulty breathing, all the while sitting in what Dunn regarded as an unusually erect position. Dunn approached Jackson and asked whether he could speak with him; Jackson agreed but appeared so nervous that Dunn asked whether he would prefer to talk in a more private place. Jackson answered affirmatively, so Dunn led him to a nearby baggage claim area. There, Dunn asked Jackson whether he was carrying any weapons; Jackson answered that he was not.

Dunn then undertook a pat-down search during which he felt an unknown object around Jackson's waist. Jackson was then handcuffed by Dunn and McLamb. Dunn asked Jackson to identify the object. Jackson was at first unable to provide any explanation but on further questioning told the officers it was a "back brace." When McLamb raised Jackson's shirt to investigate, the officers observed powder cocaine in plastic bags taped to his waist. Jackson was formally arrested and advised of his rights.

Charged with possession of cocaine with intent to distribute, Jackson moved the district court to suppress the cocaine as evidence; adopting the recommendation of the magistrate judge, the district court denied the mo-

---

[1] At the suppression hearing, neither officer could recall what steps had been taken to identify the owners of the two bags, but the briefs reveal that Jackson claimed one bag, and the other was never claimed. No evidence or contraband was found in either piece of luggage.

[2] When Dunn approached Jackson in the bus station, he did not know whether the seat or the bags to which the dog alerted belonged to Jackson.

tion. Jackson entered a conditional plea of guilty, reserving his right to appeal the denial.

## II.

We use a two-tiered standard of review for appeals from the denial of a motion to suppress: Factual findings are accepted unless clearly erroneous, and the district court's ultimate conclusion as to the constitutionality of law enforcement action is reviewed *de novo*. *See United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). We view all the evidence introduced at the suppression hearing in the light most favorable to the prevailing party, in this case the government. *Id.* (citing *United States v. Ponce*, 8 F.3d 989, 995 (5th Cir. 1993)).

## III.

Jackson's primary argument is that he was subjected to an unconstitutional seizure when two officers boarded the bus, with the driver's consent, after it pulled into the station for a scheduled layover and instructed bus passengers that they could remain on the bus during a canine search or disembark (with or without their carry-on luggage) until the search was completed.[3] We disagree. Nothing about the officers' conduct impaired Jackson's right (which he exercised) to leave the bus and terminate the encounter with police.

---

[3] Jackson was thus forced to ask himself what *The Clash* famously asked two decades ago: "Should I stay or should I go now?" Doubtless Jackson knew that if he stayed on the bus and the dog alerted to him "there would be trouble." But given the officers' ultimate discovery of the cocaine strapped to his waist, the trouble turned out to be "double," notwithstanding his decision to "go." *See The Clash*, *Combat Rock* (1982).

## A.

"[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). If every encounter between a citizen and a police officer constituted a seizure, it "would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Thus, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n.16.

Law enforcement officers do not violate the Fourth Amendment's proscription of unreasonable seizures "by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions," or "by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion); *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984) (per curiam). Even without having an objective level of suspicion, officers may initiate contact with a person and ask for identification and request permission to search baggage, provided they do not induce cooperation by coercive means.[4] Whether a person has been seized in these circumstances is a question of voluntariness: "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."

---

[4] *See Florida v. Bostick*, 501 U.S. 429, 434-35 (1991); *see also United States v. Drayton*, 536 U.S. 194, 200-01 (2002) ("The Fourth Amendment permits police officers to approach bus passengers at random to ask questions and to request their consent to searched, provided that a reasonable person would understand that he or she is free to refuse.").

*Drayton*, 536 U.S. at 201.

The police practice at issue in this case is different from that in *Bostick* and *Drayton—i.e.*, approaching bus passengers randomly to ask questions and to request their consent to searches. Here, the officers did not do that, nor did they ask consent to be searched. Instead, they merely informed the passengers that they would be conducting a canine search of the bus and that the passengers were free to disembark until the search was complete. For purposes of the Fourth Amendment, however, the relevant inquiry remains the same: whether the police conduct at issue, in light of all the circumstances, would have led a reasonable person to believe that he was barred from leaving the bus or otherwise terminating the encounter. *See Drayton*, 536 U.S. at 204.

### B.

The police did not seize Jackson—or the rest of the passengers to whom such a holding would theoretically be applicable—when they boarded the bus and gave passengers the choice of remaining there while they led a canine down the aisle or disembarking until the search was complete. The officers gave the passengers no reason to believe they were required to stay on the bus during the canine search. To the contrary, the officers explicitly informed passengers of the option to disembark the bus with or without their carry-on items, and left the aisle free for passengers to exit. In light of the fact that *every* passenger (Jackson included) exercised this option, it cannot be said that the offer of the option to leave, and thus terminate the police encounter, was understood as anything but genuine.

Moreover, as in *Drayton*, "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." *Id.* In sum, nothing the officers did or said "would suggest to a reasonable person that he or she was barred from leaving the bus or otherwise terminating the encounter." *Drayton*, 536 U.S. at 204.

Indeed, Jackson never asserts that police conduct prevented him from leaving the bus and thus terminating the encounter with police. Instead, Jackson insists that this case is different because he *had* to disembark the bus to avoid an encounter at close proximity with a narcotics canine, and that this itself should constitute a seizure within the meaning of the Fourth Amendment.

But in advancing this argument, Jackson confuses a reasonable person's belief that he was not free to terminate the encounter with police (which is the touchstone for Fourth Amendment purposes) with his desire to leave the bus (which has little, if any, relevance for Fourth Amendment purposes). Whether Jackson desired to leave the bus, or whether he regarded it as inconvenient, says nothing about whether the police conduct was coercive. *See Bostick*, 501 U.S. at 435-37. And the fact that disembarking was the only means of terminating the encounter only serves to underscore the dispositive nature of the coercion inquiry—whether, taking into account all the circumstances surrounding the encounter, disembarking was an option that a reasonable person would have regarded as being available, or whether a passenger would have felt compelled to remain onboard and be subjected to the canine search.

To be sure, if the officers had acted in a manner that conveyed to a reasonable person that they were compelled to remain onboard

4

and face the dog search, this would be a different case. Here, however, the police acted in a professional and polite manner, instructing the passengers of their right to disembark the bus before the canine search. That Jackson may not have desired to disembark is not controlling; that the police did not coerce passengers into remaining onboard is. Thus, absent coercive police conduct leading a passenger to believe he was required to remain onboard, the minor inconvenience, if any, suffered by Jackson in disembarking must yield to what has been referred to as the "compelling interest in detecting those who would traffic in deadly drugs for personal profit." *Mendenhall*, 446 U.S. at 561-62 (Powell, J., concurring).

## IV.

We now turn from the question whether Jackson was seized to whether he was subjected to an unreasonable search. That inquiry asks whether the pat-down search in the bus station, a so-called *Terry* frisk, was permissible.

## A.

The magistrate judge found that Jackson consented to Dunn's initial request to speak with him, as well as his subsequent invitation, made after observing Jackson's nervous behavior, to speak in the more private baggage area. Thus, the encounter between Dunn and Jackson in the bus station was not an investigatory detention under *Terry*, but was instead a consensual encounter.[5] It was only when

---

[5] *See United States v. Williams*, 365 F.3d 399, 405 (5th Cir. 2004) (holding, as to the same bus station, that bus passengers "voluntary entry into [the] baggage handling area for purposes of answering questions does not amount to a seizure, nor does it convert the consensual encounter into a
(continued...)

Dunn conducted a pat-down search of Jackson in the baggage area, however, that the nature of the encounter began to take the character of a *Terry* stop.[6]

In evaluating the legality of a *Terry* stop, this court must consider (1) whether the officer's action was justified at its inception and (2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. *Williams*, 365 F.3d at 405 (citing *Terry*, 392 U.S. at 19-20). As we have said, at its inception, Dunn's encounter with Jackson was justified because it was consensual. Indeed, even absent Jackson's consent, the fact that Dunn was aware of the dog alert and that one of the passengers was likely carrying drugs on his person, coupled with Jackson's nervous and erratic behavior (including what Dunn regarded as his unusually erect posture), would be sufficient to premise a reasonable and particularized suspicion that Jackson was the drug courier. At that point, even though probable cause to arrest was lacking the officers were within their constitutional authority to pat him down for their personal safety, given what they regarded as the real threat that a narcotics carrier may be armed. *United States v. Jordan*, 232 F.3d 447, 449

---

[5](...continued)
*Terry* stop").

[6] Jackson contends that the patdown was nonconsensual; the government disagrees. Because the magistrate judge did not make a finding regarding whether the patdown was consensual, and because "[w]e do not sit to resolve conflicts in descriptions of events," *United States v. Boone*, 67 F.3d 76, 78 (5th Cir. 1995), we assume *arguendo* that the patdown was nonconsensual.

(5th Cir. 2000).[7] In fact, the officers testified that in their experience, it was not unlikely that a drug courier might be armed and dangerous, and that they conducted the pat-down search to further their own safety.

As a final matter, with respect to the officers' actions in lifting Jackson's shirt after feeling objects at his waist, the magistrate judge found no problem, citing the plain-feel doctrine announced in *Minnesota v. Dickerson*, 508 U.S. 366 (1993). We need not rely on that doctrine to affirm, however, because "the raising of a suspect's shirt by a law enforcement officer does not violate the bounds established by *Terry*." *Reyes*, 349 F.3d at 225 (citing *United States v. Hill*, 545 F.2d 1191, 1193 (9th Cir. 1976)). Thus, the officers were within their constitutional authority when they raised Jackson's shirt, an act that in turn led to the discovery of the cocaine and Jackson's arrest.

Because Jackson was not seized on the bus, and the pat-down search was permissible, the order denying the motion to suppress is AFFIRMED.

---

[7] Although Justice Harlan was not certain, when *Terry* was decided, that suspected narcotics possession was the type of crime "whose nature creates a substantial likelihood that [the suspected offender] is armed," *Sibron v. New York*, 392 U.S. 40, 74 (1968) (Harlan, J., concurring), courts have achieved such certainty through time. *See, e.g.*, *United States v. Vasquez*, 634 F.2d 41, 43 (2d Cir. 1980) (officers justified in making protective frisk, "particularly in view of violent nature of narcotics crime"); *United States v. Oates*, 560 F.2d 45, 62 (2d Cir. 1977) (observing that firearms are the "tools of the trade" of narcotics dealers); *United States v. Trullo*, 809 F.2d 108, 113 (1st Cir. 1987) (frisk for weapons may accompany seizure of drug trafficking suspect); *see also United States v. Reyes*, 349 F.3d 219, 225 (5th Cir. 2003) (finding no error in pat-down of suspected drug courier in bus station based on officer's testimony that in his experience "weapons accompany narcotics").