**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 25, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JASON H. GARCIA, aka Dogg,

      Defendant-Appellant.

No. 05-4031

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:03-CR-996-TC)**

---

G. Fred Metos, McCaughey & Metos, Salt Lake City, Utah, for Defendant-Appellant.

Diana Hagen, Assistant United States Attorney (Paul M. Warner, United States Attorney, with her on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **KELLY**, **HOLLOWAY**, and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

Jason Garcia entered a conditional plea of guilty to possession of methamphetamine with intent to distribute. He now appeals the district court's denial of his motion to suppress, reiterating on appeal his claim that the police

lacked reasonable suspicion or probable cause to frisk him for weapons — and thereby discover the methamphetamine — during their entry into an apartment Mr. Garcia was visiting. We conclude that the district court correctly found that the officers had reasonable suspicion and therefore affirm.

## I. BACKGROUND

### A. Factual Background

In August 2003, Salt Lake County Sheriff's Detective Tracy Wyant learned from a patrol deputy that an ambulance had responded to a drug overdose at an apartment in Taylorsville, Utah. The deputy told Detective Wyant that he suspected additional drug activity at the apartment and asked Wyant to investigate. The deputy also informed Detective Wyant that one of the individuals involved in the overdose incident was named Dusty Kilgrow.

Detective Wyant was familiar with the apartment complex, having visited it multiple times for narcotics investigations — some of which involved suspects who used or possessed firearms. Detective Wyant performed a records check of the apartment where the overdose had occurred and learned the names of two renters: Dusty Kilgrow (the man who had been involved in the overdose incident) and Lisa Ross. Further investigation revealed that Ms. Ross had an outstanding arrest warrant and that Mr. Kilgrow was an active member of the "Lay Low Crips," a violent street gang. Detective Wyant knew or learned from the Metro Gang Task Force that in the past the Lay Low Crips had been involved in the

assault-rifle shooting of a West Valley police officer and in the attempted shooting of two Sheriff's Detectives.

Detective Wyant conducted surveillance on the apartment several times, during which he observed short-term traffic in and out of the apartment. On August 18, Detective Wyant and another detective again conducted surveillance on the apartment. In the space of a few minutes, they observed seven individuals coming in and out of the apartment; Wyant identified one of the individuals as Kilgrow. The detectives also saw that two men went out to a car, then returned to the apartment; that several individuals stood out in front of the apartment, apparently conducting countersurveillance; and that the front door was left open for some time. Detective Wyant testified that all this activity was "indicative of narcotics transactions," although from his surveillance vantage point he did not actually see any such transactions take place.

After observing the above activity, Detective Wyant called to request the assistance of the Metro Gang Task Force. Several members of the Task Force soon arrived, including Sergeant Bill Robertson, and all of the officers then approached the apartment. A woman who had also been approaching the apartment saw the officers, turned around, and began walking away. The officers stopped the woman, who identified herself as Lisa Ross, one of the apartment's renters. The officers told Ms. Ross that they were there because they had a warrant for her arrest and because they had some concerns about her apartment.

While the officers spoke with Ms. Ross, the door to the apartment opened partway and Sergeant Robertson observed several people peering out the door. He recognized one of them from prior gang investigations; that individual was also dressed in a manner consistent with gang membership. This heightened Sergeant Robertson's concern for the safety of the officers.

The officers further told Ms. Ross that they had seen seven people go into her apartment. She became very emotional and explained that her four-year-old son was in the apartment and that she was unsure who else was inside. She agreed to allow the officers to enter the apartment to check on her son and told them that she thought he was in the back of the apartment. Four or five of the officers, some with weapons drawn, then entered the apartment to do a protective sweep and to look for the child.

When Sergeant Robertson entered into the front room of the apartment, he noticed a small, clear plastic "baggie" on the floor, near the door, containing what appeared to be methamphetamine packaged for sale. A black male dressed in gang-related attire was next to the baggie and the appellant, Mr. Garcia, was about ten feet away. Mr. Garcia was not dressed in gang-related attire, and Sergeant Robertson did not see any tattoos or other indications of gang affiliation on Mr. Garcia. Although Mr. Garcia appeared nervous, he did not make any threatening moves or verbal threats toward the officers.

The officers asked the five or six persons in the front room, including Mr. Garcia, to keep their hands where the officers could see them and to stay where they were. Three officers remained in the front room, and the other officers did a protective sweep of the apartment. They found Ms. Ross's son in the back bedroom and took him outside to Ms. Ross.

The officers then conducted a pat-down search of the individuals in the front room for weapons. Sergeant Robertson testified at the suppression hearing that the pat-down was conducted because he was "concerned for the safety of the individuals in the apartment," including the officers. The presence of what appeared to be methamphetamine on the floor heightened his concern because in Sergeant Robertson's experience, firearms are often present when narcotics transactions take place. Similarly, the possible gang connection heightened Sergeant Robertson's concern that guns would be present.

Sergeant Robertson was the officer who frisked Mr. Garcia. During the pat-down, Robertson felt a large bump in Mr. Garcia's front left pocket. He asked what the object was and Mr. Garcia responded that it was drugs. Sergeant Robertson asked if it was illegal drugs, and Mr. Garcia replied affirmatively. The officers eventually confiscated two bags of methamphetamine and a piece of drug paraphernalia from Mr. Garcia.

**B. Procedural Background**

Mr. Garcia was charged with one count of possessing methamphetamine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1). He filed a motion to suppress the evidence found during the pat-down. After a hearing, at which both Detective Wyant and Sergeant Robertson testified, the district court denied Mr. Garcia's motion, concluding that the officers had reasonable suspicion to detain and conduct a pat-down of Mr. Garcia. Mr. Garcia then conditionally pled guilty to possession of methamphetamine with intent to distribute and was sentenced to 120 months in prison. Mr. Garcia timely appealed the denial of his suppression motion.[1]

---

[1]Mr. Garcia's notice of appeal incorrectly seeks to appeal "to the Utah Court of Appeals." Although this technically violates Rule 3(c)(1)(C) of the Federal Rules of Appellate Procedure — which states that a "notice of appeal must . . . name the court to which the appeal is taken," — we have long held that "a defective notice of appeal should not warrant dismissal for want of jurisdiction where the intention to appeal to a certain court of appeals may be reasonably inferred from the notice, and where the defect has not materially misled the appellee." Graves v. Gen. Ins. Corp., 381 F.2d 517, 519 (10th Cir. 1967) (accepting a notice of appeal that erroneously sought to appeal to the Supreme Court of New Mexico). It is reasonably clear from the notice of appeal that Mr. Garcia intended to appeal to this court. And, because the government timely filed a response brief in this court without even discussing the defect in Mr. Garcia's notice of appeal, the government clearly was not prejudiced or "materially misled." The error in Mr. Garcia's notice of appeal therefore does not deprive us of jurisdiction.

## II. DISCUSSION

### A. Standard of Review

When reviewing a district court decision on suppression of evidence, we must accept the court's findings of fact unless, viewing the evidence in the light most favorable to the court's findings, we conclude the findings were clearly erroneous. Evaluation of the credibility of witnesses, the weight to be given the evidence, and inferences to be drawn from the evidence are for the district court. However, the ultimate determination of whether a search and seizure were reasonable under the Fourth Amendment is subject to de novo review.

United States v. Hernandez, 93 F.3d 1493, 1498 (10th Cir. 1996). Specifically relevant to this case, "[w]e review the district court's determination of reasonable suspicion *de novo*." United States v. Barron-Cabrera, 119 F.3d 1454, 1458 (10th Cir. 1997) (citing Ornelas v. United States, 517 U.S. 690 (1996)).

### B. Analysis

"The Supreme Court has identified three general types of encounters between citizens and the police: (1) consensual encounters; (2) investigative detentions; and (3) arrests." United States v. Hishaw, 235 F.3d 565, 569 (10th Cir. 2000). The parties agree that this case involves the second type of encounter — an investigative detention.[2] More specifically, this case involves a police search of Mr. Garcia's person during an investigative detention. See United

---

[2]"[I]nvestigative detentions . . . are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity." United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996).

States v. Manjarrez, 348 F.3d 881, 886 (10th Cir. 2003) ("A pat-down is a 'search' under the Fourth Amendment.").

In evaluating whether an investigative detention and an attendant search are reasonable under the Fourth Amendment, we apply the principles announced by the Supreme Court in Terry v. Ohio, 392 U.S. 1 (1968). See Hishaw, 235 F.3d at 569. However, we note at the outset that Mr. Garcia does not challenge the officers' entry into, and "protective sweep" of, Ms. Ross's apartment. See Terry, 392 U.S. at 20 (directing courts to first consider "whether the officer's action was justified at its inception"). Furthermore, Mr. Garcia concedes that "the discovery of the drugs on the floor of the apartment would be sufficient under Terry to justify a temporary detention of Garcia to investigate that offense."[3] Thus, we assume for purposes of this appeal that the officers were justified in entering the apartment and in detaining Mr. Garcia for investigative purposes. The only question in this case, then, is whether the pat-down search of Mr. Garcia was unjustified and thus a violation of the Fourth Amendment. See Hishaw, 235 F.3d at 570 ("Even though the initial stop was justified, we must still assess the reasonableness of the subsequent pat-down search.").

### 1. Requirement of reasonable suspicion

[3]Mr. Garcia notes in his brief that Sergeant Robertson did not mention the presence of the baggie by the door in either his police report or the probable cause affidavit. However, Mr. Garcia does not appear to challenge the district court's finding that Robertson did actually observe such a baggie upon entering the apartment. In any event, that finding was not clearly erroneous.

During an investigative detention, "[p]olice officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo." United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998); see also United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993) ("Since police officers should not be required to take unnecessary risks in performing their duties, they are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a Terry stop.") (quotation, alterations omitted). In some circumstances, these safety measures may include a pat-down search for weapons. See Terry, 392 U.S. at 21–24. "The purpose of the limited pat-down search is not to discover evidence of a crime, 'but to allow the officer to pursue his investigation without fear of violence.'" Manjarrez, 348 F.3d at 886–87 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).

Although it is of course true that officers "'need not be absolutely certain that [an] individual is armed' before taking protective measures" such as a pat-down search, Gama-Bastidas, 142 F.3d at 1240 (quoting Terry, 392 U.S. at 27), such a search is also not to be conducted as a matter of course during every investigative detention, see Ybarra v. Illinois, 444 U.S. 85, 91–93 (1979). Rather, we have only allowed "an officer [to] conduct a pat-down search (or 'frisk') if he or she 'harbors an articulable and reasonable suspicion that the person is armed and dangerous.'" Hishaw, 235 F.3d at 570 (quoting Davis, 94 F.3d at 1468); see

- 9 -

also Manjarrez, 348 F.3d at 886 ("An officer may pat-down a suspect if the facts available to the officer would warrant a man of reasonable caution to believe that a frisk would be necessary to protect himself.") (quotation omitted).  An officer's suspicion must be "articulable" because, "in determining whether the officer acted reasonably . . . , due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."  Terry, 392 U.S. at 27.

In analyzing whether this reasonable suspicion standard is met, we are "to view the officer's conduct through a filter of common sense and ordinary human experience."  United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995) (quotation omitted).  Furthermore, we "consider the 'totality of the circumstances' when evaluating the validity of a pat-down."  Manjarrez, 348 F.3d at 887 (quoting Adams, 407 U.S. at 146).

### 2. Application

In this case, we have no trouble concluding that the facts known to Sergeant Robertson warranted an "articulable and reasonable suspicion" that Mr. Garcia was armed and dangerous, thereby justifying Sergeant Robertson's pat-down search of Mr. Garcia.

## a. Drug transactions

First, we have held that a connection with drug transactions can support a reasonable suspicion that a suspect is armed and dangerous. In Hishaw, police officers had learned that a certain apartment was being used to distribute drugs, and Mr. Hishaw was suspected to be the drug dealer. 235 F.3d at 567. The officers conducted surveillance and observed Hishaw entering and leaving the apartment numerous times and dealing with persons in the parking lot. Id. Police later stopped Hishaw's pickup truck, conducted a pat-down search of Hishaw, and found crack cocaine. Id. In reviewing the denial of Hishaw's motion to suppress, we first concluded that the evidence of drug activity provided reasonable suspicion justifying the stop of Hishaw's pickup. Id. at 570. More to the point, we also concluded that "the evidence supporting the officers' reasonable suspicion that Mr. Hishaw was distributing drugs (i.e. his coming and going from the apartment named in the search warrant and the hand-to-hand contact observed outside the apartment) also indicated that he might be armed and dangerous." Id. Thus, we concluded that the pat-down was justified and affirmed denial of the motion to suppress. Id. at 571.

Numerous other cases lend support to the proposition that an individual's involvement with drug transactions or distribution can support reasonable suspicion to frisk that individual for weapons. In Hishaw, we favorably cited cases from other circuits to this effect. Id. at 570–71 (citing United States v.

- 11 -

Perrin, 45 F.3d 869, 873 (4th Cir. 1995) ("[I]t is certainly reasonable for an officer to believe that a person engaged in the selling of crack cocaine may be carrying a weapon for protection"); United States v. Anderson, 859 F.2d 1171, 1177 (3d Cir. 1988) (holding that an officer's pat-down search of the occupants of a car was reasonable after the officer observed large amounts of money on the front seat, became suspicious that it might be drug money, and was concerned for his safety "because persons involved with drugs often carry weapons")); see also id. at 570 (citing United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998) (holding that "when [an] officer has a reasonable suspicion that illegal drugs are in [a] vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons" and that "[t]he indisputable nexus between drugs and guns presumptively creates a reasonable suspicion of danger to the officer")).

More recent cases from this and other courts also provide support for our conclusion in Hishaw. See United States v. Johnson, 364 F.3d 1185, 1194–95 (10th Cir. 2004) (concluding that a weapons frisk was permissible "[b]ecause [the officer] reasonably suspected that Johnson might be involved in drug dealing, kidnapping, or prostitution," which are crimes "typically associated with some sort of weapon, often guns"); United States v. Bustos-Torres, 396 F.3d 935, 943 (8th Cir.) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and

dangerous when the person is suspected of being involved in a drug transaction"), cert. denied, 125 S. Ct. 2557 (2005); United States v. $109,179 in U.S. Currency, 228 F.3d 1080, 1086 (9th Cir. 2000) (finding a frisk justified and asserting that "[b]ecause the police reasonably suspected [the defendant] of dealing in narcotics, it was not unreasonable to believe that he might be armed"); see also United States v. Jackson, 390 F.3d 393, 399 (5th Cir. 2004) (when officers had reasonable suspicion that the defendant was a drug courier, a protective frisk was justified by "the real threat that a narcotics carrier may be armed"), vacated on other grounds, 544 U.S. 917 (2005). All of these cases stand for the proposition that an individual's known connection with drug transactions is a factor supporting reasonable suspicion to frisk that individual for weapons.[4]

In this case, the evidence available to the officers indicated that drug transactions were occurring in the apartment. The original reason for surveilling the apartment was that a drug overdose had taken place there. Detective Wyant had also observed short-term traffic at the apartment, had seen what appeared to be countersurveillance, and had seen other activity that in his experience was

---

[4]The validity of this proposition is borne out by the experience and training of the officers in this case. Sergeant Robertson testified that in his experience, "when narcotics transactions take place . . . a number of times also firearms are present." Similarly, Detective Wyant's training taught him that it is "commonplace for weapons, specifically handguns and similar to be present in the distribution and use of narcotics." And in conducting other narcotics investigations at the very same apartment complex where Mr. Garcia was searched, Detective Wyant had previously encountered suspects who used or possessed firearms.

consistent with narcotics transactions. Furthermore, one of the apartment's known renters, Dusty Kilgrow, who had been connected to the drug overdose incident, was a member of a violent street gang that had an extensive history with narcotics. Detective Wyant had identified Kilgrow as one of the seven individuals present at the apartment during the August 18 surveillance, and had told Sergeant Robertson about Kilgrow's presence in preparation for approaching the apartment. Finally, upon entering the apartment Sergeant Robertson observed a baggie of what appeared to be methamphetamine lying near the door of the apartment. The methamphetamine appeared to be packaged for sale. It was reasonable for the officers to believe from these facts that there were drug transactions occurring at the apartment.

Moreover, it was reasonable to believe that Mr. Garcia had some connection to or involvement with the drug transactions. As the district court stated,

> Mr. Garcia was present in a private home associated with a violent street gang member where illegal drugs were suspected, where (based on the officers' training and experience) firearms were likely to be, and where illegal drugs were spotted inside. It was reasonable for the officers to connect him with the suspected criminal activity.

Dist. Ct. Op. at 10 (footnote added). The officers could reasonably suspect that everyone present in the front room (where the drugs were found) was involved in the suspected drug transactions. See United States v. Vite-Espinoza, 342 F.3d 462, 467 (6th Cir. 2003) (upholding a weapons frisk) ("[The police] had reason to

suspect . . . that the house was used as a factory of counterfeit immigration and identification documents for Mexican nationals and for the trafficking of marijuana. . . . [R]ational inferences warranted reasonable suspicions that those encountered on the premises would either be counterfeiters themselves or their illegal alien customers . . . or that they would be armed and dangerous, because drug traffickers tend to be so."); see also Maryland v. Pringle, 540 U.S. 366, 373 (2003) ("The quantity of drugs and cash . . . indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him."). Based on this connection alone, it was reasonable for the officers to conduct a weapons frisk of Mr. Garcia. See Johnson, 364 F.3d at 1194–95 (concluding that a weapons frisk was permissible "[b]ecause [the officer] reasonably suspected that Johnson *might be involved in drug dealing*, kidnapping, or prostitution") (emphasis added); Hishaw, 235 F.3d at 570 ("[T]he evidence supporting the officers' reasonable suspicion that Mr. Hishaw was distributing drugs . . . also indicated that he might be armed and dangerous."); Bustos-Torres, 396 F.3d at 943 ("[I]t is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction").

### b.  Gang connection

The apparent gang connection provides additional reason to uphold the district court's conclusion in this case. See United States v. Osbourne, 326 F.3d

274, 278 (1st Cir. 2003) (one factor in upholding the reasonableness of a frisk was that the defendant "was a member of a violent street gang"); see also United States v. Atlas, 94 F.3d 447, 450–51 (8th Cir. 1996) (officers had reasonable suspicion that a suspect was armed and dangerous in part because "the officers were responding to a call in a dangerous neighborhood, one that was high in gang activity").  Sergeant Robertson testified that based on his training and experience he knew that guns are often part of the gang environment.  In our society today this observation resonates with "common sense and ordinary human experience." Alvarez, 68 F.3d at 1244 (quotation omitted).  Furthermore, the police officers in this case knew that the apartment in which Mr. Garcia was found was connected with at least one member of the Lay Low Crips, a violent street gang with a history of firearms violence toward police officers.  In fact, Detective Wyant had identified Kilgrow, the gang member, as one of the persons present at the apartment at the time the officers approached.  See United States v. Flett, 806 F.2d 823, 828 (8th Cir. 1986) (holding that "the location of the appellant in the home of a known gang member charged with a narcotic violation" was one factor that supported "a reasonable inference that the appellant may be a gang member and may be armed and dangerous").  Sergeant Robertson also observed another individual at the apartment who was dressed in gang-related attire and who he recognized from previous gang investigations.

Mr. Garcia emphasizes that, unlike the appellant in <u>Flett</u>, he was not dressed in gang attire and that nothing about his appearance indicated to the officers that he was a member of a gang. He also emphasizes that the officers did not recognize him as a gang member and argues that a frisk may not be justified based solely on the company one keeps. <u>See</u> <u>United States v. Clay</u>, 640 F.2d 157 (8th Cir. 1981) (suppressing evidence found during a pat-down search of a man who stopped by a house at which police were executing a search warrant for drugs and firearms). We nonetheless conclude that it was reasonable for the officers to believe that the persons present in the front room, who were all apparently connected to drug transactions involving known and suspected gang members, all had some degree of gang affiliation. Although not necessarily determinative by itself, that gang connection further supports the reasonableness of a weapons frisk of those present, including Mr. Garcia.

Mr. Garcia further emphasizes that he was compliant with requests made by the officers, that he made no threatening statements or movements, and that the officers were able to see the hands of everyone in the front room. Although those factors likely helped avoid escalating an already tense situation, we conclude that it did not eliminate the officers' reasonable suspicion that one or more of the persons present in the front room was armed and dangerous or make the weapons frisk of Mr. Garcia unreasonable. <u>See</u> <u>Flett</u>, 806 F.2d at 828 ("The fact that the appellant made no threatening moves toward the officer or that the officer did not

notice any bulge does not lessen the reasonableness of the officer's actions."); cf.
United States v. Holmes, 376 F.3d 270, 278 (4th Cir. 2004) ("[G]iven the number
of police on the scene and the tactics the officers used, that [the defendants]
cooperated with the police is entirely unsurprising.  However, a reasonable officer
in this situation—knowledgeable of the suspects' criminal history *and* that the
gang to which the suspects belonged was known to be armed—would be aware of
the risk that absent a protective search . . . , the suspects might, as the stop
proceeded, seek to take advantage of a gap in the officers' vigilance.").

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the denial of Mr. Garcia's motion
to suppress evidence.