ORDER AND JUDGMENT*
PAUL KELLY, JR., Circuit Judge.
Defendant-Appellant Joseph Paul House entered a conditional plea of guilty to one count of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), and was sentenced to thirty-nine months’ imprisonment and three years’ supervised release. On appeal, he argues that the district court erred by denying his motion to suppress because (1) the initial encounter with the arresting officer was not a consensual encounter, and (2) even if it was, the officer’s subsequent frisk was not based upon reasonable suspicion. While we cannot agree with the first point, the second is well-taken and we reverse.

Background

At 12:30 in the afternoon on November 20, 2009, Officer Aaron Daley had just finished investigating a “suspicious activity” call from a woman who heard noises coming from her basement. The woman claimed that her dog alerted toward the basement and ran downstairs; the women fled until police arrived. United States v. House, No. 2:10-CR-007, 2010 WL 4103548 (D.Utah Oct.18, 2010); Aplee. Br. 2. Upon investigation, there was no evidence of a forced entry and nothing was missing from the house. House, 2010 WL 4103548, at *1. The officer did notice a “doggy door” that was large enough for a human to gain access; however, no one gained entry that way. As the officer was walking to his car, after spending nearly fifteen minutes in the house, 1 R. 39, he noticed Mr. House — the only pedestrian in the area — walking eastbound on the sidewalk in the direction of the woman’s house. Id., 2010 WL 4103548, at *1.
Another patrol car approached the intersection where Mr. House was standing, and Mr. House did an “immediate turnaround,” walking in the opposite direction. Id. The officer got into his car, turned around, and approached Mr. House at another intersection. The officer thought that Mr. House avoided making eye contact. Id. The officer then parked his car and approached Mr. House from the rear. Id. Mr. House was holding a cell phone to his ear with his right hand and his left hand was in the pocket of his “puffy” coat. Id., 2010 WL 4103548, at *2. From ten to twelve feet away, the officer asked, “hey, can I talk to you, hey, can I ask you a few questions?” Id. Mr. House continued to walk and talk on his cell phone, so the officer repeated his request and Mr. House ended his call and turned around to face him. Id. The encounter took place on the sidewalk, with just the officer and Mr. House. Id.
Mr. House finally turned around, holding his cell phone in his right hand, and kept his left hand in his coat pocket. Id. The officer noticed what appeared to be a bulge in Mr. House’s left coat pocket “that was making it larger than just what an arm or hand would make a coat stick out.” 1 R. 49. When questioned, Mr. House *785 replied “no” as to whether he had any weapons on his person, 1 R. 49, but the officer simultaneously noticed the end of a black folding knife protruding from his right coat pocket, 2010 WL 4103548, at *2. The officer recognized it as a knife similar to the type that he carried on duty. Id. He instructed Mr. House to place his hands behind his back, and the officer removed the knife from Mr. House’s pocket. Id. After securing the knife, the officer stated he conducted a “Terry frisk” of Mr. House in “highly probable [areas] for weapons” and felt the butt of a gun near where the bulge was on Mr. House’s left side. Id.) 1 R. 30, 31, 51. A backup officer arrived at this point, and the arresting officer retrieved a gun from Mr. House’s left waistband. Id., 2010 WL 4103548, at *3. The serial number on the gun had been obliterated and was filed down. Id. The district court denied the motion to suppress on the basis that the initial encounter between Mr. House and the officer was consensual, and that the Terry frisk was justified by officer safety concerns. Id., 2010 WL 4103548, at *5-6. The district court reasoned that although no intruder had been found in the woman’s home, Mr. House was the only person the officer had seen, Mr. House had apparently changed direction after seeing a marked patrol car, something other than Mr. House’s hand may have been in his jacket pocket, and, most significantly, Mr. House had replied that he had no weapons when he had a knife in his pocket. Id.

Discussion

When reviewing a denial of a motion to suppress, we “view the evidence in the light most favorable to the government, accept the district court’s findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment.” United States v. Katoa, 379 F.3d 1203, 1205 (10th Cir.2004).
A. Was the Initial Encounter Between House and the Officer Consensual?
We review de novo “the relevant circumstances to determine whether an interaction between an individual and a law enforcement officer is a consensual encounter that does not implicate the Fourth Amendment.” United States v. Abdenbi, 361 F.3d 1282, 1291 (10th Cir.2004). We have developed three categories of police-citizen encounters. United States v. Madrid, 30 F.3d 1269, 1275 (10th Cir.1994). The first “involves the voluntary cooperation of a citizen in response to non-coercive questioning.” Id. The second is a Terry stop, “involving only a brief, non-intrusive detention and frisk for weapons when officers have a reasonable suspicion that the defendant has committed a crime or is about to do so.” Madrid, 30 F.3d at 1275. The third is an arrest. Id. In that case, this court explained:
[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers’ requests or otherwise terminate the encounter.
Id. at 1276 (alteration in original) (quoting United States v. Little, 18 F.3d 1499, 1503 (10th Cir.1994)). The inquiry is objective in nature; the subjective perceptions of the suspect are not determinative. See id.
Relevant circumstances used to determine whether an interaction between an officer and an individual is consensual include:
(1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by *786 an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual’s personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.
United States v. Rogers, 556 F.3d 1130, 1137-38 (10th Cir.2009). The determination is based on the totality of the circumstances. Id. at 1138.
In Rogers, a police officer patrolling the halls of a hotel known for drug activity and prostitution saw the defendant, whom he knew from past encounters as “Graveyard,” exiting a hotel suite. Id. at 1134. The officer asked the defendant if he could speak to him, and the defendant seemed more nervous than in past encounters. Id. The defendant backed into a suite and informed the officer that the officer should talk to another man who was lying on a bed. At this point, the officer noticed a bag of marijuana in plain view and arrested both men. Id. at 1134-35. We held that the encounter was consensual because, given the totality of the circumstances, the “[o]fficer ... did not touch Defendant, use aggressive language, brandish a weapon, or retain any of Defendant’s personal effects.” Id. at 1138.
In this case, only one officer was present for most of the interaction, which took place on a public sidewalk in the middle of the day. The officer remained some distance from Mr. House before the frisk, and the district court found credible the officer’s characterization of the interaction as “an everyday encounter.” House, 2010 WL 4103548, at *2. The district court also noted that Mr. House testified that he felt like he was “free to leave at [the point that the officer asked him to get off of his cell phone]” but did not do so because staying to answer questions was “the right thing to do.” Id., 2010 WL 4103548, at *2. Also, the officer asked Mr. House if he could talk to him or ask him a few questions. Id. Based on the totality of the circumstances, we agree with the district court that the officer’s interaction with Mr. House was consensual. The only factor that weighs against consent is that the interaction took place in the absence of other members of the public, although it was on a public street, but this is not determinative. See Rogers, 556 F.3d at 1138.
B. Did Officer Daley Have Reasonable Articulable Suspicion to Frisk?
In Terry, the Supreme Court stated that “where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous ... he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.” 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (emphasis added). The government argues that no reasonable, articulable suspicion of criminal activity is necessary when a search is incident to a consensual stop, and there need be only a reasonable, articulable suspicion that a person is armed and dangerous. Aplee. Br. 14-22 (citing United States v. Manjarrez, 348 F.3d 881 (10th Cir.2003))[1]. Though we *787 doubt Manjarrez goes this far, we are willing to assume (without deciding) for purposes of this case that an officer may-frisk a person pursuant to a consensual encounter when they have only a reasonable articulable suspicion that a person is armed and presently dangerous without any suspicion of criminal activity. At any rate, based upon the totality of the circumstances, Officer Daley lacked the reasonable, articulable suspicion that Mr. House was presently dangerous required to justify a protective frisk, rendering the frisk unlawful.
We have considered a variety of unlawful activities supportive of a reasonable, articulable suspicion that a person is armed and dangerous. Drug trafficking comes to mind, see United States v. Garcia, 459 F.3d 1059, 1064-66 (10th Cir.2006), as does involvement in gang activity or prostitution, id. at 1066-67. While one suspicious factor may not be sufficient, such as presence in a high crime area or unwillingness to speak to an officer, the existence of several factors may tip the scales toward a reasonable suspicion to search. See U.S. v. Maddox, 388 F.3d 1356, 1366-67 (10th Cir.2004).
In United States v. Harris, 313 F.3d 1228 (10th Cir.2002), we considered nervous and evasive behavior as a ground for reasonable suspicion that a person is armed and dangerous. In Harris, an officer approached the defendant on the street and asked for identification after a tipster called and claimed that two men in dark clothing were smoking narcotics in a Dairy Queen parking lot. Id. at 1231. The defendant and his companion fit the informant’s description, smelled of marijuana, and refused to comply after the officer repeatedly asked them to show identification, and the defendant appeared nervous with his hands in his pockets. Id. at 1231— 32. The officer asked the defendant to remove his hands from his pockets, and when he refused to do so, the officer approached him, removed his hands from his pockets, escorted him to the police car, and frisked him. Id. at 1232. The defendant argued, among other things, that the officer did not have a reasonable articulable suspicion that he was armed and dangerous. Id. at 1236. While the defendant’s nervousness alone was not enough to justify the frisk, the court emphasized that the defendant refused to take his hands out of his pockets when asked, giving the officer a reasonable justification for believing that he was armed and dangerous. Id.
This court also found reasonable articu-lable suspicion that a suspect was armed and dangerous when an officer pulled over a car for a lawful traffic stop at 2:30 am in a high crime area, a backseat passenger gave the officer a false identity, and a background check on one of the passengers revealed that he had a lengthy criminal history of violent crime and was “known to be armed and dangerous.” United States v. Rice, 483 F.3d 1079, 1084-85 (10th Cir.2007). Similarly, in Garcia, this court held that a pat down search was legal pursuant to a lawful search of an apartment for drugs because “an individual’s involvement with drug transactions or distribution can support reasonable suspicion to frisk that individual for weapons.” *788 459 F.3d at 1064. Furthermore, at least one of the apartment’s known renters was a known member of a violent street gang. Id. at 1066-67.
In a recent Fourth Circuit case, however, the court held that a pat down search of a passenger pursuant to a lawful traffic stop at night was unlawful when based only on “caution data” that the passenger had a prior criminal history involving armed robbery and his misrepresentation that his driver’s license was valid. United States v. Powell, 666 F.3d 180, 185-188 (4th Cir.2011). The court noted that “[without more, the caution data certainly does not justify a reasonable suspicion that [the passenger] was armed and dangerous .... ” Id. at 188. Furthermore, the court held that a false statement to an officer, without more, typically will be insufficient to conclude that a suspect is armed and dangerous. Id. at 188-189.
As the Sixth Circuit noted in United States v. Johnson, “before an officer effectuates a limited frisk for weapons ... the officer must have a reasonable belief that the suspect is both (1) armed, and (2) dangerous.” 246 Fed.Appx. 982, 988 (6th Cir.2007) (unpublished). We consider each requirement to determine if the frisk of Mr. House was lawful.
Here, a reasonable officer could conclude that Mr. House was armed. Officer Daley observed a folded knife in Mr. House’s pocket and a bulge under his jacket. 1 R. 49. But there was no indication that he was presently dangerous to Officer Daley or other citizens. Being armed does not ineluctably equate with dangerousness. Nothing suggests Mr. House was involved in drug activity, gang activity, or any other crime. In fact, the officer testified at the suppression hearing that Mr. House’s turning around at the sight of police and the prior call where no evidence of an intruder was found were all that “raised [his] level of concern.” 1 R. 56. When the officer asked if Mr. House had a weapon, and Mr. House said “no,” the officer testified that he saw what appeared to be a bulge under Mr. House’s jacket pocket and a folded knife sticking out of his jacket pocket. 1 R. 49. The blade of the knife was not exposed. Id. Suspecting that Mr. House was lying, the officer approached him, removed the knife from his pocket, and continued to frisk him in the areas that he believed were “high probable areas for weapons.” 1 R. 51. Nothing in the record indicates that the officer ever asked Mr. House to remove his hand from his pocket, like in Hands, 313 F.3d at 1232; 1 R. 29, 48-49, and Mr. House was fully compliant, 1 R. 28 (“He turned around, and it didn’t appear to me that he wanted to talk to me, but he was compliant.”). “[I]f a policeman sees a suspicious bulge which possibly could be a gun in the pocket of a pedestrian who is not engaged in any suspicious conduct, the officer may not approach him and conduct a frisk. And this is so even though the bulge would support a frisk had there been a prior lawful stop.” Wayne R. Lafave, 4 SEARCH and Seizure § 9.6(a) (2004).
In fact, when the officer first saw Mr. House, he was walking toward the residence in question some fifteen minutes after the police first arrived there to investigate. 1 R. 39. Also, Mr. House did not engage in “headlong flight,” like in Illinois, v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), but merely turned around and walked in the opposite direction when he saw police. Though the officer did spot a knife in Mr. House’s pocket after asking him if he had a weapon, the knife was folded and the blade was not exposed. 1 R. 49. The government argues that Ten~y allows a frisk when “an officer is justified in believing that the individual whose suspicious behavior he is *789 investigating at close range is armed and presently dangerous to the officer or others _” Aplee. Br. 16 (quoting Terry, 392 U.S. at 24, 88 S.Ct. 1868) (emphasis added). A folded knife in a person’s pocket hardly poses a danger to an armed officer standing six to eight feet away. 1 R. 29; 2 R. 90. Similarly, nothing in our caselaw suggests that Mr. House’s answer that he did not have a weapon, though he carried a folding knife, warranted an immediate protective frisk.[2] 1 R. 51.
It is likely that many law-abiding citizens would not consider themselves armed with a weapon, while carrying a folded pocket knife, when approached on the street and questioned unexpectedly by an officer. To allow a search based on the hunch that a citizen walking down the street is illegally carrying a firearm, without more, serves to erode the precious protections of the Second and Fourth Amendments. See Terry, 392 U.S. at 22, 88 S.Ct. 1868 (“[I]ntrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches [are] a result this Court has consistently refused to sanction.”).
An officer is free to initiate a consensual encounter without any articulable suspicion. Such an encounter may develop previously unconfirmed suspicions of criminal behavior and/or result in genuine concerns for officer safety. United States v. Jones, 606 F.3d 964, 968 (8th Cir.2010). The difficulty in this case is that the consensual encounter did neither; in the absence of which, the evidence must be suppressed as violative of the Fourth Amendment.
C. The Dissent
The dissent is simply incorrect when it states that Mr. House was “in the vicinity of a potential home break in.” At most, the officer was responding to a suspicious noise call which he then investigated and found no evidence of any crime, let alone a break-in. Mr. House was walking toward the residence more than fifteen minutes after the call to police, and then turned away at the sight of law enforcement. Although the dissent posits' that a person who is armed and detained is usually dangerous relying upon Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), where the defendant was lawfully stopped for expired license plates, here Mr. House was free to leave, having engaged in a purely consensual encounter.
The dissent suggests that we dismiss the danger posed by knives, miss the significance of Mr. House’s answer that he had no weapons, require an officer to consider whether a folded knife is a weapon, focus too heavily on the knife, and ignore the threat of the firearm. It contends that this case is controlled by Ryburn v. Huff, . — . U.S.-, 132 S.Ct. 987, 181 L.Ed.2d 966 (2012), where the Supreme Court reversed a denial of qualified immunity to officers entering a home without a warrant. The Court held that the officers could have an objectively reasonable basis for concluding that an imminent threat of *790 violence existed where officers believed that a student had threatened a school shooting and the student’s mother ran into the house, refusing to answer whether there were any guns in the house. Id. at 991-92.
This case differs markedly. We have considered the totality of the circumstances. No one disagrees that a knife can be dangerous, but context matters. Here, the folded knife was observed from several feet away. The officer removed the knife prior to the challenged protective frisk. Given the facts found by the district court, the officer could conclude that Mr. House was armed, despite his denial. But the facts fall far short of any danger, let alone imminent danger. By the officer’s own admission, Mr. House was cooperative.
In short, the dissent simply comes too close to equating being armed with being dangerous regardless of the circumstances. The examples relied upon by the dissent as illustrating circumstances where an armed person might not be considered dangerous — where law enforcement is aware that a citizen is a retired policeman or cooperative with a license to carry a gun — portend too little Fourth Amendment protection for the average citizen and elide the distinction between armed and dangerous.
REVERSED.

 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

. Manjarrez does not, in fact, stand for the proposition that reasonable articulable suspicion of criminal activity is unnecessary before conducting a Terry frisk. The encounter in Manjarrez began as a traffic stop based upon reasonable suspicion, a brief detention took *787 place thereafter, and the defendant was subsequently free to leave. 348 F.3d at 884. The defendant then consented to additional questions and a search of the vehicle. Id.. Prior to the search, a brief pat down occurred which yielded nothing. The court determined that the pat down was lawful based upon the prior consent to search the car, but the legality of the pat down was probably irrelevant because the contraband in the car was discovered based upon the prior consent to search. In other words, the pat down did not vitiate the prior consent to search the car.

. The officer's testimony suggests that he immediately frisked Mr. House after he saw the knife and Mr. House responded that he did not have any weapons on him:
Q: "And so at that point, after you had asked him if he had weapons and he said no, you put his hands behind his back once you saw the tip of the knife, right?”
A: "Yes.”
Q: "And you pulled the knife out of the pocket?”
A: "Yes, I did.”
Q: "Then you continued to frisk at that point the rest of his body?”
A: "Just the areas that I believed are the high probable areas for weapons.”
1 R. 51.